change may prove in each bankruptcy proceeding the full amount due thereon at the time of the filing of the several petitions in bankruptcy, and that such holder may receive dividends upon such proofs of claim subject only to the limitation that he shall not receive more than the full amount of the claim due him. Board of County Commissioners v. Hurley, 169 Fed. 92, 94 C. C. A. 362; In re Simon (D. C.) 197 Fed. 105; In re New York Commercial Co., 233 Fed. 906, 147 C. C. A. 580; In re Shatz (D. C.) 251 Fed. 351.

It follows, therefore, that, had the bank not attempted to avoid criticism from the bank examiner by the taking of demand notes, with the several bills of exchange styled as collateral thereto, no question could arise as to the bank's right to prove its claim in the present proceeding for the full amount due upon such trade acceptances at the time of the filing of the petition herein, notwithstanding proof had already been made for the same or greater amounts in the matter of the estates of the bankrupt acceptors. It cannot likewise be doubted that, after the allowance of such claims, the payment of dividends upon the claim by one bankrupt estate would in no wise affect the right to dividends upon the claim against the other.

The question is, therefore, as has been stated, whether by the acts of the parties prior to bankruptcy the claim upon the several acceptances was converted into a secured claim, with the acceptances as security. The referee held that it was, and reduced the amount of the provable claim by the amount received as dividends from the bankrupt acceptors after the filing of the petition herein and before the claim was allowed.

Certainly, the bank could not prove upon both the demand notes and the obligation of the bankrupt as indorser of the acceptances, but at the time the bank discounted the acceptances the bank became the absolute owner of such instruments, and the obligation of the bankrupt to pay, if the acceptor did not, became fixed. At the time the demand notes were given, there was certainly no intention upon the part of either of the parties to release the bankrupt from this obligation, which had already become fixed and absolute. Nor do we think that the giving of the demand notes had any such effect at law, against the intention of the parties, especially since no effect was given to it in the account of the bankrupt, and since the bank retained, with the consent of the bankrupt, the possession and control of the acceptances, and never abandoned its position as a holder for value thereof. The purpose of the giving of the demand notes was simply to satisfy a bank examiner, and although such purpose may not be highly commendable, as involving a certain degree of deception, we are clearly of the opinion that the obligation of the bankrupt herein, having once attached, was never subsequently discharged. This obligation is still existing, was provable as such, and as it existed at the time of the filing of the petition herein, viz. the obligation of the indorsing bankrupt, for the amount still due upon such trade acceptances at the time of the filing of the petition herein. In our opinion, no deduction should be made for the amount of dividends received from the estates of the bankrupt acceptors after the date just above mentioned.

---

## BALTIMORE & O. R. CO. v. FLECHTNER.*

(Circuit Court of Appeals, Sixth Circuit. June 6, 1924.)

No. 3986.

**1. Commerce ⊗⇒27(7)—Brakeman at time of injury held employed in "interstate commerce."**

A brakeman employed in switchyards, and where injured assisting in making up a train consisting of both interstate and intrastate cars, by seeing that all were properly coupled, *held* employed in "interstate commerce," within Employers' Liability Act, § 1 (Comp. St. § 8657).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

---

⊗⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 266 U. S. —, 45 Sup. Ct. 95, 69 L. Ed. —.

**2. Evidence** ⚖⇒244(15)—**Wheel report of railroad company admissible against company.**

A wheel report, constituting a part of the official records of a railroad company, kept in accordance with the regulations of the Interstate Commerce Commission, is admissible as against the company.

**3. Master and servant** ⚖⇒286(14)—**Railroad's negligence, as to brakeman on pathway held for jury.**

Where injury to plaintiff, a brakeman, resulted from his foot catching in a rusty hoop of the kind used on railroad spike kegs, which was lying in a path between tracks in a switching yard of defendant, not used by the general public, over which path plaintiff was passing at night in the course of his duty, the question of defendant's negligence in failing to maintain a reasonably safe place to work *held* properly submitted to the jury.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action at law by John J. Flechtner against the Baltimore & Ohio Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

J. P. Wood and W. T. Kinder, both of Cleveland, Ohio (Tolles, Hogsett, Ginn & Morley and J. W. Reavis, all of Cleveland, Ohio, on the brief), for plaintiff in error.

Louis H. Winch, of Cleveland, Ohio (Payer, Winch, Minshall & Karch, of Cleveland, Ohio, and Nash & Henslee, of Garrett, Ind., on the brief), for defendant in error.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

MACK, Circuit Judge. Writ of error from judgment for $28,-354 for personal injuries. Plaintiff, at the time of the injury, 10:30 p. m., was engaged as a brakeman in defendant's classification yards at Willard, Ohio, in making up a train on track No. 9, scheduled to go out at 6:30 o'clock the next morning. The tracks in this yard are used for switching purposes; the cars are left on a hump or elevated track for switching, and are then run down to one or more of the 22 tracks which spread out like a fan and parallel each other. Some 40 cars had already been placed on this track; some of them were loaded with freight destined, according to the wheel report, hereinafter considered, to points outside of Ohio. The last cut of cars switched onto track No. 9 to make up this train, consisted of a number of hopper cars, all empty, except one, and all destined for points within Ohio. Plaintiff rode the fourth or fifth car from the head end of these cars, some 12 or 15 car lengths, until it bumped into the standing cars; then he alighted and started forward on the pathway between tracks 8 and 9, intending to couple together the cars last sent down and the ones into which they had bumped, and to see that all cars in the train were coupled together. He had walked 3 or 4 car lengths when the cars started to move ahead; he knew from this that the engine had come down from the hump, coupled onto the west end of the cut, and was pushing the train down onto track No. 9, so that it would clear the switch. He gave a signal to the engineer to stop,

so that he could see, when the cars stopped and the slack ran out, whether or not they were all coupled together. After he had given the signal, he took a few steps, when his foot caught in a hoop in the path; he was thrown headfirst in towards the cars, grasped the handle on the side of one of the moving cars, and was dragged half a car length; his feet struck a plank alongside of the track; one foot was thrown onto the rail, run over, and crushed.

There is evidence that, while the yards are not fenced in, the public did not come there; that the hoop was rusty on both sides, observed to be as rusty at the time of the injury as at the time of the trial; that it was of the kind used on kegs holding railroad spikes.

[1] 1. If there was admissible evidence that some of the cars in the train were destined to points beyond the state of Ohio, we are of the opinion that under the authorities cited in the case of B. & O. R. R. Co. v. Kast (C. C. A.) 299 Fed. 419, argued together with this case and decided on this day, the parties were engaged in interstate commerce at the time of the injury. Plaintiff was no longer on the intrastate cars; his work was not confined to them; his duty was to see that all the cars, interstate and intrastate, were properly coupled together for interstate movement as to part of them; and at the moment of injury he was engaged in that specific duty. The court, therefore, rightly charged the jury that the parties were engaged in interstate commerce within the provisions of the federal Employers' Liability Act (Comp. St. §§ 8657–8665) at the time of the injury. Davis, Agt., v. Dowling (C. C. A.) 284 Fed. 670.

[2] 2. The evidence of the interstate destination of the cars was a copy of the wheel report, showing inter alia the destination on defendant's line of each car. Defendant's failure to produce the original report on a subpœna which, fairly interpreted, called for this report, justified introduction of the copy after the train dispatcher had satisfied himself by communication with his office that it was a correct copy; in any event, defendant's objection was not clearly to the use of the copy instead of the original, but to the original itself. This objection is without merit: the wheel report is defendant's own official record of the movement of traffic, prepared and kept in accordance with the regulations of the Interstate Commerce Commission, pursuant to section 20 of the Interstate Commerce Act (Comp. St. § 8592). Certainly as against defendant, whose agents made it in the course of their duty, it is properly receivable in evidence as an admission of the truth of its contents.

[3] 3. In one respect at least the facts here are stronger than in the Kast Case: The rusty condition of the hoop justified a submission to the jury of the question whether or not defendant had actual notice, or in the exercise of due care should have known in sufficient time to remove it, that the hoop was improperly there, and whether or not, because of its presence, the place was reasonably safe for its employés.

The further question whether an employé, for whose negligence defendant, under the Federal Employers' Liability Law, was liable, or a stranger left the hoop there, was not a mere guess or determination of probabilities without evidence; the railroad spike keg, character

of the hoop and the actual inaccessibility of the general public to the narrow path between these switching tracks, were circumstances to be weighed by the jury in the light of the conditions prevailing on the night of the accident. The court properly denied defendant's motion for an instructed verdict.

Judgment affirmed.

---

## SIMMONS v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. July 2, 1924.)

No. 4015.

1. Criminal law ⬳569—Defense of entrapment not seriously considered.

Where, in nine months, defendant, a physician, gave 108 persons 4,095 prescriptions, calling for 79,592 grains of morphine, his volume of business conclusively shows his intent, and defense of entrapment need not be seriously considered.

2. Criminal law ⬳1165(1)—Conviction of one plainly guilty not reversed for minor errors.

Where defendant was plainly guilty, a conviction will not be set aside, even if there were errors which would require a reversal in a doubtful case.

3. Criminal law ⬳37—Entrapment not shown.

In a prosecution under the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), that prescriptions were given to addict, who was in pay of government, acting as a detective, *held* not to show forbidden entrapment.

4. Poisons ⬳4—Requiring patients to produce certificates under Tennessee statute, conflicting with federal act, held no defense.

That physician required his patients to produce a certificate that they were afflicted with incurable diseases, as required by Acts Tenn. 1919, c. 105, and regulations thereunder, *held* not to constitute exculpatory good faith, within Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q), as state law conflicts with federal act.

In Error to the District Court of the United States for the Nashville Division of the Middle District of Tennessee; Xenophen Hicks, Judge.

J. W. Simmons was convicted of violating the Harrison Anti-Narcotic Act, and he brings error. Affirmed.

A. M. Tillman, of Nashville, Tenn. (Tillman & McCall, of Nashville, Tenn., on the brief), for plaintiff in error.

Howard B. Shofner, Asst. U. S. Atty., of Nashville, Tenn. (A. V. McLane, U. S. Atty., of Lewisburg, Tenn., on the brief), for the United States.

Before DENISON and DONAHUE, Circuit Judges, and TUTTLE, District Judge.

DENISON, Circuit Judge. [1, 2] Dr. Simmons, a practicing physician at Nashville, Tenn., was convicted of furnishing morphine in violation of the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q). It appeared that during the period of nine months he had given to 108 persons, all of whom were morphine addicts, a total of .

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes